# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO. 3:26-cv-00321-MR

ROBERT A. MIDDLETON, JR.,     )
                       )
       Petitioner,     )
                       )
vs.                   )     __MEMORANDUM OF__
                       )     __DECISION AND ORDER__
                       )
LESLIE COOLEY DISMUKES,     )
Secretary, North Carolina     )
Department of Adult Correction,     )
                       )
       Respondent.     )
_____ )

**THIS MATTER** is before the Court on initial review of the pro se Petition for Writ of Habeas Corpus filed by Robert A. Middleton, Jr. (herein "Petitioner") pursuant to 28 U.S.C. § 2254. [Doc. 1]. Also before the Court are the Petitioner's Motion for Appointment of Counsel [Doc. 3], and Motion for Request for Discovery. [Doc. 4].

## I.    BACKGROUND

The Petitioner is a prisoner of the State of North Carolina. [Doc. 1 at 1]. The Petitioner was convicted by a jury on one count of first-degree murder and one count of intentional child abuse inflicting serious bodily injury on February 28, 2023, in Gaston County Superior Court. [Id.]. The trial court

entered separate judgments, sentencing the Petitioner to life imprisonment without parole for his conviction of first-degree murder and imposing a concurrent, active term of 180 to 228 months imprisonment for his conviction of intentional child abuse inflicting serious bodily injury. State v. Middleton, 297 N.C. App. 592, 597, 910 S.E.2d 757, 761 (N.C. App. 2025).

The Petitioner filed a direct appeal to the North Carolina Court of Appeals. In a published opinion, the appellate court stated, "[a]fter careful review, we conclude that [Petitioner] received a fair trial, free from error." That court affirmed the Petitioner's judgments January 15, 2025. Middleton, 297 N.C. App. at 593, 910 S.E.2d at 759; [Doc. 1 at 2]. The Petitioner sought further direct review in the North Carolina Supreme Court. State v. Middleton, Case No. 56P25-1, Docket Sheet (N.C. 2025). The state supreme court denied the Petitioner's discretionary review request May 21, 2025. Id. The Petitioner did not file a certiorari petition in the U.S. Supreme Court. [Doc. 1 at 3].

On June 2, 2025, the Petitioner filed a Motion for Appropriate Relief ("MAR") in the Gaston County Superior Court raising the following two claims: (1) Petitioner's Fourteenth Amendment due process rights were violated when he was convicted on the false, material testimony of the jailhouse informant, Brandon Woods; and (2) Petitioner raised newly

2

discovered evidence. [Doc. 1 at 3].  The trial court denied Petitioner's MAR June 6, 2025. [Doc. 1-1 at 1].  The Petitioner filed a certiorari petition with the North Carolina Court of Appeals on July 28, 2025, seeking review of the trial court's order denying his MAR which the appellate court denied on December 9, 2025.  [Id. at 2].  On December 30, 2025, the Petitioner filed a certiorari petition with the North Carolina Supreme Court seeking review of the state court of appeals' denial order.  The state supreme court dismissed the Petitioner's certiorari petition March 18, 2026. [Id. at 3].

The Petitioner filed the instant § 2254 petition in this Court on April 23, 2026, asserting the following four Grounds for relief: (1) the trial court erred in denying the Petitioner's motion to dismiss the felony first degree murder charge based on felony child abuse; (2) the trial court erred in denying the Petitioner's motion to dismiss the felony child abuse inflicting serious bodily injury charge; (3) Petitioner's Fourteenth Amendment due process rights were violated when he was convicted on the false, material testimony of the jailhouse informant, Brandon Woods; and, (4) "Defendant presenting Newly discovered Evidence."  [Doc. 1 at pp. 5; 7-8; 10].  The Petitioner also has filed motions for the appointment of counsel [Doc. 3] and for requesting discovery pertaining to Mr. Woods.  [Doc. 4].

3

## II.   FACTUAL BACKGROUND

The facts surrounding the Petitioner's convictions were set forth by the

North Carolina Court of Appeals as follows:

[Petitioner] and Takaylia Young ("Ms. Young") began a relationship in the spring of 2018. Soon after the couple began living together, Ms. Young became pregnant. She terminated the pregnancy at [Petitioner]'s urging; however, she told [Petitioner] that if she became pregnant again, she would not obtain another abortion. In October 2019, Ms. Young discovered that she was pregnant again—this time, with twins. But when she told [Petitioner], he "wasn't too excited about it" and hung up the phone. [Petitioner] made it clear to Ms. Young that he wanted her to abort the twins. Ms. Young refused.

Twins Dylan and Daniel were born prematurely in May 2020, and they remained in the neonatal intensive care unit ("NICU") until early June. When they were discharged from the NICU, Ms. Young brought the twins home to the apartment she shared with [Petitioner]. On 12 and 18 June 2020, the twins had wellness checks with their pediatrician, during which nothing unusual was noted.

On Saturday, 20 June 2020, Ms. Young and her stepfather drove to Walmart in Belmont to get groceries, diapers, and other necessities, leaving [Petitioner] home alone with the twins for a couple of hours. [Petitioner] was playing video games when Ms. Young and her stepfather returned from their errands. Ms. Young inquired about the twins, and [Petitioner] "said they were fine."

However, the next day, 21 June 2020, Ms. Young began to notice concerning changes in Dylan. She observed that Dylan "was off," in that "he was really, really tired, like, exhausted tired." The twins had an eye doctor's appointment scheduled for early Monday morning, 22 June 2020, which was only the twelfth day since their release from the NICU. But Dylan had not fed since Sunday night, after multiple attempted feedings throughout the night and into Monday morning. Before the twins' appointment, Ms. Young

4

called their pediatrician and left a message expressing concern that Dylan was not eating.

At the eye doctor's office, Dylan failed to blink his eyes during dilation, and "he just didn't look right and [his] breathing patterns ... [weren't] right." Meanwhile, the twins' pediatrician returned Ms. Young's phone call and instructed her to take Dylan directly to the local emergency room. Although Ms. Young heeded the pediatrician's advice, Dylan's condition worsened at the emergency room, and he was airlifted to Levine Children's Hospital ("Levine") in Charlotte. There, Dylan was diagnosed with, inter alia, "a fractured skull and ... severe bleeding in the brain." Dylan was also severely dehydrated and unable to breathe on his own; he was given fluids and medication and placed on life support.

Dr. Kendra Ham ("Dr. Ham"), a child-abuse pediatrician at Levine, testified at trial that Dylan had a parietal skull fracture on the left side of his head, along with "associated scalp swelling," which "happen[ed] quickly after [an impact], ... up to 72 hours after an injury occurred." Dr. Ham also noted the existence of a bilateral subdural hematoma—a brain injury that typically results from "extreme force" or "rapid acceleration, deceleration"—which had occurred "within the last 72 hours." According to Dr. Ham, this injury could not have been caused by "a simple fall from an adult height," and Dylan's records showed no "pre-existing condition or injury" that would account for it.

In addition, Dylan suffered (1) bilateral subarachnoid hemorrhages; (2) an intraventricular hemorrhage, which Dr. Ham noted was not typically seen "in accidental injuries"; (3) cerebral edema, or "swelling of the brain"; and (4) a fracture to his left wrist, which Dr. Ham said was "very specific for physical abuse." Dr. Ham explained that "[d]ue to the constellation and extent of [Dylan's] injuries," her "medical assessment was consistent with abusive head trauma." According to Dr. Ham, Dylan's injuries could not have resulted from "a simple fall" or "accidentally bump[ing the] child's head into the wall or door frame"; rather, Dr. Ham explained, Dylan's injuries were consistent with those that

5

she would expect to see from "someone shaking [the] child and throwing [him] on the floor."

On the evening of 23 June 2020, Daniel was also admitted to Levine, where doctors noticed "bruising and swelling on [his] eyes." According to Dr. Ham's report, which was admitted at trial as State's Exhibit 34, Daniel "presented [at Levine] for a medical screening exam per recommendations due to his twin brother being admitted to the [pediatric intensive care unit] with injuries concerning for abusive head trauma and physical abuse." Following a full examination, doctors determined that Daniel "had similar injuries [to Dylan]. He also had a brain fracture and several bleeds on his brain." Dr. Ham diagnosed Daniel with (1) a left parietal skull fracture; (2) a subdural hematoma; (3) a subarachnoid hemorrhage; and (4) bruising to his upper left eyelid. Dr. Ham testified that, as with Dylan, Daniel's injuries were "consistent with inflicted trauma or abusive head trauma" but not with "a bump into the wall" or "a simple fall."

During his hospitalization, Daniel exhibited "intermittent hypothermia ... and feeding difficulties believed to be due to his traumatic brain injury"; however, his condition eventually improved, and he was discharged from Levine on 8 July 2020. That same day, Dylan "was withdrawn from life support due to his very poor prognosis." He died that day.

Dr. Thomas Owens ("Dr. Owens"), a forensic pathologist and medical examiner, performed an autopsy on Dylan's body on 9 July 2020. Dr. Owens testified that Dylan suffered (1) a skull fracture on the left side of his head, which "require[d] an impact"; (2) a hemorrhage in the left parietal tissue; (3) bilateral subarachnoid hemorrhages caused by "violent, rapid, forceful shaking"; and (4) a fracture on the left wrist, caused by the arm "being moved back and forth in a rapid manner." Dr. Owens ultimately opined that Dylan's death was caused by "blunt force head trauma due to a nonaccidental method."

* * * * * * * * * *

6

Investigators representing various law enforcement and child protective services agencies questioned [Petitioner] and Ms. Young on multiple occasions during the twins' stay at Levine. [Petitioner] initially reported no knowledge of any traumatic events, although he admitted that he had once "plopped down" on the bed beside Dylan during a nighttime feeding, causing Dylan's head to rise "approximately two inches off the bed." [Petitioner] shared this story with at least three investigators, including Detective Albert Fleming ("Detective Fleming") of the Gastonia Police Department.

On 23 June 2020, Ms. Young told a DSS caseworker that [Petitioner] "would sometimes be fast and rough" in his interactions with the twins, leading her to ask him "to be gentler with the children." Ms. Young also reported that when she first asked [Petitioner] about the twins' injuries, he denied any knowledge of what had occurred. However, [Petitioner] eventually "offered one explanation." [Petitioner] told Ms. Young that he had awoken one night because he heard one of the twins crying: "It was dark in the hall so he picked one of the boys up, ... [they] had spit up on themselves, and they were crying so he was trying to pick the baby up and accidentally ran into the corner of the wall in the bedroom."

At Ms. Young's urging, [Petitioner] repeated this story to DSS. Ms. Young also asked the physicians at Levine whether the events described by [Petitioner] could have caused the twins' injuries, but "they told [her] it couldn't have."

On 20 July 2020, a grand jury returned indictments charging [Petitioner] with murder (as to Dylan) and intentional child abuse inflicting serious bodily injury (as to Daniel).

[Petitioner] continued to adopt different stories throughout the investigation of the case and while he awaited trial in this matter. While he was in jail, [Petitioner] spoke to fellow inmate Brandon Woods ("Mr. Woods") about the twins and the reasons for his incarceration. Mr. Woods testified at trial that the "first story" that [Petitioner] told him about Dylan's injuries was that an "old lady" had "bumped into him while he was carrying his baby and he

7

dropped his baby"; however, this story "[didn't] sound right" to Mr. Woods. [Petitioner] later told Mr. Woods a different version of the "same little story," in which "two Mexican kids ... playing soccer ... bumped into [Petitioner]," who "dropped [the] baby, and [Petitioner] just kept it moving." Mr. Woods testified that he ultimately told [Petitioner] that he "didn't believe it .... [the] story kept changing and [Petitioner] needed to keep it real."

According to Mr. Woods, upon this confrontation, [Petitioner] broke down and

> said that he was playing his [video] game and the baby kept crying and [he] couldn't get the baby to stop crying and didn't know what [the baby] wanted. He said he got frustrated, and when the baby wouldn't take a bottle, then bam bam and [he] hit the baby with the bottle and the baby started crying louder.... He said the baby kept ... making these little noises, and he picked [the baby] up ... and he threw [the baby] down.

Mr. Woods, who was incarcerated on drug-related charges, shared [Petitioner]'s statements with Detective Fleming in October 2020. He testified, however, that he did not receive "any consideration from the State" as a result of the information that he provided to law enforcement officers in [Petitioner]'s case.

On 14 February 2023, [Petitioner]'s case came on for jury trial in Gaston County Superior Court. At the close of the State's evidence, [Petitioner] moved to dismiss both charges due to insufficient evidence, and he renewed his motion at the close of all evidence; the trial court denied [Petitioner]'s motion on both occasions.

On 28 February 2023, the jury returned verdicts finding [Petitioner] guilty of first-degree murder and intentional child abuse inflicting serious bodily injury. The trial court entered separate judgments, sentencing [Petitioner] to life imprisonment without parole for his conviction of first-degree murder and imposing a concurrent, active term of 180 to 228 months'

imprisonment for his conviction of intentional child abuse inflicting serious bodily injury.

Middleton, 297 N.C. App. at 593-97, 910 S.E.2d at 759-61 (footnotes omitted).

## III. STANDARD OF REVIEW

In accordance with the Rules Governing Section 2254 Cases in the United States District Courts, the Court has reviewed the petition. Rule 4, 28 U.S.C.A. foll. §2254. Rule 4 further directs the district court to dismiss a habeas petition when it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief. Id.; Wolfe v. Johnson, 565 F.3d 140 (4th Cir. 2009).

In reviewing Petitioner's claims, the Court must consider the requirements governing petitions for habeas corpus under 28 U.S.C. § 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). That section of the AEDPA applies to "a person in custody under a state-court judgment who seeks a determination that the custody violates the Constitution, laws, or treaties of the United States." Rule 1(a)(1), 28 U.S.C. foll. § 2254. A federal court may not grant § 2254 relief as to any claim "adjudicated on the merits" in state court unless the state court's adjudication of such claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d).

A state court's decision constitutes an unreasonable application of clearly established federal law under § 2254(d)(1) when the state court correctly identifies the "governing legal principle . . . but unreasonably applies that principle to the facts of the . . . case." Barnes v. Joyner, 751 F.3d 229, 238 (4th Cir. 2014) (citation omitted). To find an "unreasonable application of federal law" requires a "substantially higher threshold" to overcome. Schiro v. Landrigan, 550 U.S. 465, 473 (2007). In making this assessment, the habeas court looks "to whether the state court's application of law was objectively unreasonable and not simply whether the state court applied the law incorrectly." Barnes, 751 F.3d at 238-39 (citation omitted).

For a state court's factual determination to be held unreasonable under § 2254(d)(2), "[the determination] must be more than merely incorrect or erroneous." Williams v. Stirling, 914 F.3d 302, 312 (4th Cir. 2019) (citation omitted). The state court's finding must be "sufficiently against the weight of the evidence that it is objectively unreasonable." Id. (citation omitted). The

10

AEDPA also provides that "a determination of a factual issue made by a State court shall be presumed to be correct" absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1). These provisions of the AEDPA, "operating in tandem," require that a petitioner seeking relief under § 2254(d)(2) establish that the state court's factual finding was "incorrect by clear and convincing evidence, and that the corresponding factual determination was objectively unreasonable in light of the record before the court." Merzbacher v. Shearin, 706 F.3d 356, 364 (4th Cir. 2013) (quoting Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (internal quotation marks omitted)).

In sum, a federal court "shall not" grant a writ of habeas corpus unless the earlier decision took an "unreasonable" view of the facts or law. 28 U.S.C. § 2254(d). By design, this "standard is difficult to meet." Harrington v. Richter, 562 U.S. 86, 102 (2011). The term "unreasonable" refers not to "ordinary error," plain error, or even to circumstances where the petitioner offers "a strong case for relief," but rather to "extreme malfunctions in the state criminal justice syste[m]." Id. (internal citation omitted). The critical question is whether the state court "managed to blunder so badly that every fairminded jurist would disagree" with its outcome. Mays v. Hines, 141 S. Ct. 1145, 1149 (2021).

## IV. DISCUSSION

### A. Initial Review of § 2254 Petition

#### 1. Grounds One and Two

The Petitioner raises in Grounds One and Two of his § 2254 petition the same two sufficiency of the evidence arguments that he raised before the state trial and appellate courts on direct review. More importantly, however, in this matter the Petitioner contends only that the North Carolina courts erroneously interpreted North Carolina law. Petitioner, thus, has argued no deprivation of any **federal rights** in either claim put forth in Grounds One and Two of this habeas action.

A state inmate may invoke federal habeas jurisdiction only if he can establish that he is a person convicted under a state-court judgment and that he is in "custody in violation of the Constitution, laws, or treaties of the United States." 28 U.S.C. § 2254. The Supreme Court has made clear that a federal habeas court will not review any claim that concerns how a state court construes or applies its own statutory law and precedents.

> We have stated many times that "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); see also Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874–75, 79 L.Ed.2d 29 (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas

review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

Estelle v. McGuire, 502 U.S. 62, 63 (1991).

The Petitioner alleges no federal law violations anywhere in Grounds One and Two of his § 2254 petition. And for good reason – Petitioner did not assert, and the North Carolina appellate courts never so much as mentioned, any federal constitutional, statutory, or case law violations in their decisions affirming the trial court's rulings denying the Petitioner's motions to dismiss his state case. Despite Petitioner's unsuccessful litigation of his state-law sufficiency of the evidence claims in his direct appeal, he cannot seek review of them in this habeas action.  As such, Petitioner's claims as asserted in Grounds One and Two are without merit and will be denied.

### 2.   Ground Three

In Ground Three of his § 2254 petition, the Petitioner asserts his Fourteenth Amendment due process rights were violated when he was convicted on the false, material testimony of the jailhouse informant, Brandon Woods.  [Doc.1 at 8]. The Petitioner raised this claim in his MAR filed with the state trial court which denied it.  While that court did not explain why it denied this claim in its written order filed June 9, 2025, no explanation was necessary.  As determined by the state court of appeals, the Petitioner

13

procedurally defaulted all of his federal constitutional claims when he failed to raise them during his trial.

The Petitioner on direct appeal advanced a constitutional argument similar to the one contained in Ground Three. In his direct appeal, the Petitioner asserted that the state trial court erred by admitting the testimony of Mr. Woods because Mr. Woods was acting as an agent of the state who interrogated him on behalf of the state in violation of the Petitioner's rights under the Fifth and Sixth Amendments to the federal constitution. Middleton, 297 N.C. App. at 604, 910 S.E.2d at 766. The appellate court held that the Petitioner waived on appeal any constitutional arguments that he did not directly address to the trial court's attention:

> [Petitioner] did not object to the admission of Mr. Woods's testimony—on constitutional grounds or otherwise—and therefore, he has waived appellate review of this issue. "In order to preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." State v. Patterson, 249 N.C. App. 659, 664, 791 S.E.2d 517, 521 (citation omitted), disc. review denied, 369 N.C. 199, 794 S.E.2d 328 (2016); see also N.C.R. App. P. 10(a)(1).

> Moreover, although [Petitioner] requests plain error review, "constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal, not even for plain error." State v. Wilkins, 287 N.C. App. 343, 349, 882 S.E.2d 454, 458 (2022) (cleaned up), disc. review denied, 385 N.C. 313, 890 S.E.2d 903 (2023). The argument [Petitioner] presents on appeal "is solely a constitutional one." Id. Thus, it is "an issue that is fully

14

waived if not timely asserted in the trial court." Id. Accordingly, this argument is waived.

Middleton, 297 N.C. App. at 604, 910 S.E.2d at 766. By failing to preserve for review in the state trial court any of his federal constitutional claims, the Petitioner has procedurally defaulted those claims in this Court.

Due to "basic principles of federalism," federal courts are only permitted to review "those state-court decisions that implicate federal constitutional rights." Kornahrens v. Evatt, 66 F.3d 1350, 1357 (4th Cir. 1995). If a defendant convicted in state court fails to identify and pursue a federal constitutional claim at trial, on direct appeal, or in state post-conviction proceedings, the state court is deprived of the opportunity to evaluate the federal claim "causing the state courts to rule against him solely on state-law procedural grounds." Id. Federal habeas review in this circumstance is inappropriate because the state's judgment in such a case is based on an "independent and adequate state ground" since no federal constitutional claim was ever presented to or reviewed by the state. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991).

The doctrine of procedural default barred the Petitioner from pursuing this claim in his MAR on collateral review in the state trial court, and the doctrine will bar him from pursuing it now in this habeas Court. "A procedural default ... occurs when a habeas petitioner fails to exhaust available

15

remedies in state court and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " <u>Breard v. Pruett</u>, 134 F.3d 615, 619 (4th Cir. 1998) (quoting <u>Coleman</u>, 501 U.S. at 735 n.1). In this case, the Petitioner did not raise any of his alleged federal constitutional challenges during his state trial. In his direct appeal, the Petitioner attempted to bring federal constitutional challenges to the admission of Mr. Woods' testimony, but the appellate court concluded on the merits that the Petitioner waived any such challenges.  When the Petitioner filed his MAR raising in part a Fourteenth Amendment challenge to Mr. Woods' testimony, the state trial court was precluded by North Carolina procedural law from entertaining this challenge. <u>See</u>, N.C. Gen. Stat. § 15A-1419(a)(2) (MAR should be denied when the ground or issue underlying the motion was previously determined on the merits upon an appeal from the judgment).  Accordingly, because the Petitioner has no legal means at this time to compel the North Carolina courts to address his Fourteenth Amendment claim in the first instance, he has procedurally defaulted it.  The Petitioner's claim set forth in Ground Three cannot now be considered by this Court.

The only way for the Petitioner to avoid procedural default is through a showing of "cause and actual prejudice." <u>Reed v. Ross</u>, 468 U.S. 1, 11 (1984)

(citation omitted). "Cause for a procedural default . . . ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." Murray v. Carrier, 477 U.S. 478, 492 (1986). To establish prejudice, the prisoner must show not merely a substantial federal claim, such that " 'the errors at ... trial created a possibility of prejudice,' but rather that the constitutional violation 'worked to his actual and substantial disadvantage.' " Id. at 494 (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

The Petitioner cannot show cause or actual prejudice for his defaulted claim. The Petitioner has not alleged any "external impediment" that prevented him from raising an alleged Fourteenth Amendment violation during his trial. The Petitioner was represented by counsel during trial, and he has asserted no ineffectiveness of his trial counsel at all, much less to support a showing for "cause." Even if the Petitioner could show cause, which he has not, he cannot demonstrate that the error worked to his actual and substantial disadvantage. The North Carolina Court of Appeals found that the Petitioner's "challenge to Mr. Woods's testimony does not concern 'inherently incredible' observations but rather the type of witness-credibility determinations that jurors are called upon to make in nearly every trial. [Petitioner] has thus failed to show that the trial court's admission of this

17

testimony constituted error, much less plain error." <u>Middleton</u>, 297 N.C. App. at 604, 910 S.E.2d at 765-66.

This Court cannot conclude that the North Carolina Court of Appeals' resolution of this testimonial admissibility issue resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Petitioner's claim as asserted in Ground Three, therefore, is without merit and will be denied.

### 3. Ground Four

The Petitioner's ostensible claim, as set forth in its entirety in Ground Four, states:

> Defendant presenting Newly discovered Evidence.
>
> Presenting 4 Affidavits of Newly Discovered Evidence. One of those Affidavits is showing the mother admitting to having an accident with one of the children while defendant was sleep. She dropping the child's head on the dresser and his head hits the corner of it. She has the child at 2am while defendant is sleep in the living room. This fit in with the medical Evidence and the detective's testimony as well. She has the children from when they were completely fine at 11:30pm Sunday night until 4am Monday morning when one of the children went unconscious.

[Doc. 1 at 10 (errors uncorrected)].

To begin, and not to overlook the obvious, the Petitioner has presented no affidavits in any filing associated with this action. The Petitioner's short allegation of what he contends happened to one of his children while he was

asleep, according to "[o]ne of those Affidavits," is nothing short of a self-serving and unverified projection of desired events. The Petitioner has not presented any evidence, newly discovered or otherwise, establishing any facts beneficial to himself. The Petitioner's assertions of fact are not in the nature of any exculpatory scientific evidence, sworn and trustworthy eyewitness accounts, or critical physical evidence establishing that it was impossible for him to be responsible for the crimes a jury concluded he committed.

Finally, in the face of his multiple, contradictory explanations of what happened to his children while in his care, the Petitioner has articulated no innocence theory anywhere in his petition or any other document filed herein. Such is not an actual innocence claim founded upon newly discovered evidence. The Petitioner has failed to state a claim in Ground Four and that Ground shall be denied and dismissed for that reason.

**B.** **Motion for Appointment of Counsel**

The Petitioner moves this Court for the appointment of counsel to represent him. There is no constitutional right to the appointment of counsel in a post-conviction proceedings. Crowe v. United States, 175 F.2d 799 (4th Cir. 1949); Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). Further, the § 2254 petition filed herein is subject to dismissal as all four Grounds set forth

19

alleged claims that will be denied on the merits. Accordingly, the motion for appointment of counsel [Doc. 3] shall be denied.

### C. Motion for Discovery

The Petitioner has filed a Motion for Request for Discovery. [Doc. 4]. In his motion, the Petitioner seeks the "discovery of documents related to his Jailhouse informant claims." [Id. at 1]. The Petitioner is not entitled to the relief sought in his motion. "A habeas prisoner is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing § 2254 Cases provides, "[a] party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

The Petitioner has shown no good cause to justify the ordering of discovery in this matter. As discussed above, the Petitioner's § 2254 petition shall be denied and dismissed. As such, any motion seeking discovery would be futile in any event. The Petitioner's Motion for Request for Discovery [Doc. 4] shall be denied.

## V.    CONCLUSION

For the reasons set forth above, the Court rejects all the Petitioner's claims for relief contained in Grounds One through Four.  Petitioner's § 2254 petition shall be denied and dismissed.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability. 28 U.S.C. § 2253(c)(2);  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (noting that, in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (holding that, when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

## O R D E R

**IT IS, THEREFORE, ORDERED** that:

1.    The Petition for Writ of Habeas Corpus [Doc. 1] is **DENIED** and **DISMISSED**.

2.    The Petitioner's Motion for Appointment of Counsel [Doc. 3] is **DENIED**.

3.	The Petitioner's Motion for Request for Discovery [Doc. 4] is **DENIED**.

4.	The Court **DECLINES** to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases.

5.	The Clerk of Court is respectfully directed to terminate this case.

**IT IS SO ORDERED.**

Signed: May 14, 2026

Martin Reidinger
Chief United States District Judge